LEONARD L. CRONE *v.* JAMES A. CONNELLY ET AL.
(AC 22156)

Foti, Mihalakos and Hennessy, Js.

Argued October 29, 2002—officially released February 4, 2003

*Leonard M. Crone*, with whom, on the brief, was *Doreen M. Alegi*, for the appellant (plaintiff).

*Arthur C. Laske III*, assistant city attorney, for the appellee (named defendant).

*Barbara Brazzel-Massaro*, associate city attorney, for the appellees (defendant Lester H. Garrett et al.).

*Opinion*

HENNESSY, J. The plaintiff, Leonard L. Crone, on this false arrest claim, appeals from the judgment of the trial court, rendered after the court directed a verdict in favor of the defendants, James A. Connelly, Thomas Sweeney, Richard Mancini and Lester H. Garrett. The plaintiff claims that the court improperly granted the defendants' motion for a directed verdict by concluding that (1) there was insufficient evidence to establish that they had conspired to violate the plaintiff's rights and (2) probable cause did exist to arrest the plaintiff. We conclude that under the facts of this case, the court properly directed a verdict. See *Ham* v. *Greene*, 248 Conn. 508, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999).

The following facts are relevant for the resolution of the plaintiff's appeal. The plaintiff was employed as a teacher at the Beardsley School in Bridgeport. On May 13, 1996, seven fifth grade students complained that the plaintiff shoved, pushed and physically injured them on a playground during physical education class. The students were sent to the school nurse by their classroom teacher, and the nurse documented the physical injuries. The classroom teacher also reported the incident to the school administrators and the department of children and families.

The plaintiff contended that he did not cause any physical injuries to the students or even touch them. The defendant Connelly, who was the superintendent of the Bridgeport school system at the time of the incident, initiated an investigation and assigned Alexander Norwood to conduct interviews with the participants. Connelly directed Susan Smith, a social worker, to interview each of the alleged victims. Connelly also interviewed the plaintiff concerning the alleged incident. Connelly recommended that the plaintiff be suspended from his teaching and coaching duties, and further recommended that the plaintiff be brought before the Bridgeport board of education (board) for a disciplinary hearing.

A disciplinary hearing was conducted by the board, and witnesses presented evidence at the meeting. The board imposed penalties that included suspension without pay and transferring the plaintiff to another school.

The defendant Mancini was a sergeant in the youth bureau of the Bridgeport police department. Mancini received the initial report of a citizen complaint filed on May 13, 1996, at 6 p.m. by one of the students' mothers. Mancini assigned the case to the defendant Garrett, a detective in the Bridgeport police department. Garrett interviewed and obtained signed sworn statements from seven students in the plaintiff's physical education class. The students stated that the plaintiff became irate and started to pull and grab them when they did not follow his instructions after the physical education class had ended. Garrett also received the school nurse's report that documented the victims' physical injuries.

In addition, Garrett interviewed Susan L. Spivack, an employee of the board who was working in the business magnet program and who was present in her parked car near the playground during the alleged incident.

Spivack had known the plaintiff for twenty years and was meeting him on her lunch hour. Her sworn statement to Garrett indicated that she saw the students "play fighting with one another" and disobeying the plaintiff's directions. Spivack also stated that the plaintiff shouted at the students, but she did not see the plaintiff grab, punch or hit any of the students.

On July 26, 1996, Garrett submitted an application for an arrest warrant on the basis of his investigation. The application included summaries of Garrett's interviews with the seven alleged victims and a summary of the school nurse's report. Garrett's summary of his interview with Spivack on the arrest warrant application stated: "[O]n May 13th at [approximately 12:15 p.m.], she arrived at Beardsley School to meet with [the plaintiff]. At this time [the plaintiff] had directed his students to line up. Some of the students seemed to ignore his direction, they were disorderly, kicking, pushing and play fighting with one another. [The plaintiff] had to shout to the students to get into line. She observed this action from her vehicle." There was no mention of Spivack's statement that she did not see the plaintiff grab, punch or hit any of the students. The application for an arrest warrant and the witnesses' statements were reviewed by a prosecutor, Roslyn Fleisher. The arrest warrant was then signed by Fleisher and presented to a judge to review and sign.

In July, 1996, Mancini informed the plaintiff that an arrest warrant had been issued, and the plaintiff went to the police station to be processed. Subsequently, in March, 1997, the plaintiff was tried and found not guilty by a jury on all of the charges filed against him.

On December 2, 1998, the plaintiff filed his amended complaint,[1] which claimed, inter alia, that the defen-

---

[1] Count one alleged a violation of constitutional rights under 42 U.S.C. § 1983. Count two alleged false arrest on the basis of an arrest warrant that purportedly was procured improperly and illegally. Count three alleged intentional infliction of emotional distress as a result of extreme and outra-

dants had conspired to violate his constitutional rights by seeking out alleged victims, bestowing favors on the alleged victims and convincing students to sign false statements against him. The plaintiff also alleged in the complaint that the defendants had filed an arrest application that "contained knowingly false, incomplete and/or misleading information."

On July 5, 2001, trial began before the jury. The plaintiff addressed the conspiracy allegations by presenting evidence that thirteen years prior to the alleged incident, he had run for political office and, during his campaign, the plaintiff had been critical of Connelly as superintendent of the Bridgeport school system. In addition, the plaintiff had held a position as city clerk, and Connelly had inquired as to any impropriety of the plaintiff's holding that position simultaneously with his position as a full-time teacher. The plaintiff stated that he believed those incidents were the basis for Connelly's investigation of the students' allegations and any subsequent conspiracy among the defendants to violate his constitutional rights.

The defendant Sweeney was the police chief for the city of Bridgeport.[2] Sweeney testified that he did not have any contact with Connelly concerning the criminal investigation. He testified that he did not have any involvement with the investigation and never saw the application for an arrest warrant. Sweeney testified that his only involvement with the case was the forwarding

geous behavior. Count four alleged malicious prosecution in that the defendants purportedly had acted without probable cause.

[2] The plaintiff's complaint alleged that Sweeney had violated the plaintiff's constitutional rights by conspiring with the other defendants and by allowing Garrett to have "submitted an application for an arrest warrant that contained knowingly false, incomplete and/or misleading information." There was also evidence presented at trial that Sweeney did not have a *written* policy for the submission of arrest warrant applications in regard to containing accurate and complete information and full statements of witnesses.

of a letter concerning the alleged incident to the youth bureau of the police department.

Mancini testified that he never spoke with Connelly concerning the allegations against the plaintiff. Garrett testified that his only contact with Connelly was a telephone call to obtain the names of people he should investigate concerning the alleged incident. Connelly testified that he forwarded that telephone call to another employee of the board.

On July 6, 2001, at the close of the plaintiff's case, the defendants made a motion for a directed verdict on all counts. The court granted the motion as to the defendant Connelly with respect to the counts alleging false arrest and malicious prosecution. The court denied the motion in all other respects without prejudice subject to raising them at the close of the defendants' case.

On July 12, 2001, the defendants rested their case and renewed their motion for a directed verdict. The court stated: "I'll reserve decision and we'll proceed and see what the jury does. And then that's without prejudice; that if you want to raise it again, I certainly will hear full argument at that point."

On July 16, 2001, after the jurors sent a note to the court stating that they were deadlocked, the court read to them a "Chip Smith" charge.[3] The jury then returned another note stating that it still was deadlocked and saw no hope of reaching a unanimous verdict. The defendants again renewed their motion for a directed verdict. After hearing arguments from the parties, the

---

[3] "A Chip Smith instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity. See *State* v. *Smith*, 49 Conn. 376 (1881); see also 5 Connecticut Practice, D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 4.8." (Internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 51 n.2, 801 A.2d 730 (2002).

court granted the motion in favor of the defendants.[4]
This appeal followed.

The standard of review for a challenge to a directed
verdict is well settled. "A directed verdict is justified if
on the evidence the jury could not reasonably and
legally have reached any other conclusion. . . . In
reviewing the trial court's action in directing a verdict
for [the defendants], we must consider the evidence
in the light most favorable to the plaintiff." (Citations

---

[4] The court stated in relevant part: "I did reserve decision and of course
the reason is that . . . I've always tried to have a full trial with the expecta-
tion that we'll get a verdict one way or another, up or down. . . . In this
particular case, we have the claim of a conspiracy among four individuals—
Connelly, Garrett, Mancini and Sweeney. I can find nothing in the record
to show that there was any conspiracy between these four people by any
basis of credible evidence, except by surmise or conjecture.

"Then we look at the actions of the individuals themselves and the question
is whether there was some intentional or reckless action on their part to
deprive [the plaintiff] of one or more of his civil rights. The linchpin of all
this is whether there was probable cause for his arrest or whether because
of an absence of a particular portion of Dr. Spivack's statement that there
was not [and] had that been included, there would have not been probable
cause. . . .

"I do find that I will direct a verdict on the first count of the complaint
on the basis that there was not sufficient credible evidence to sustain the
burden of the plaintiff to show there was a violation of the constitutional
rights of [the plaintiff]. The second count was false arrest, the linchpin in
this case. And this count, of course, again, is a question of whether there
was probable cause to . . . seek the arrest of [the plaintiff]. My comments
on the previous count—again, I indicate that it is the opinion of the court
that there was sufficient probable cause and, therefore, that no arrest was
improperly procured on the part of those who acted in this particular case.
. . . The third count, intentional infliction of emotional distress, we do have
the two things that must occur. First . . . the action must be outrageous
and the distress must be severe. On both of these counts, it is the court's
opinion that the plaintiff failed to show that these particular issues were
proven by a fair preponderance of the evidence . . . . And finally, the last
count was malicious prosecution. And for that, we need a lack of probable
cause and also a showing of malice. . . . And I find no credible evidence
of malice on the part of any of these four [defendants] as to and against
[the plaintiff] and, therefore, would direct a verdict on the fourth and last
count of the plaintiff's complaint."

omitted; internal quotation marks omitted.) *Berry* v. *Loiseau*, 223 Conn. 786, 819–20, 614 A.2d 414 (1992).

"Generally, litigants have a constitutional right to have factual issues resolved by the jury. . . . Directed verdicts [therefore] are historically not favored and can be upheld on appeal only when the jury could not have reasonably and legally reached any other conclusion. . . . We review a trial court's decision to direct a verdict for the defendant[s] by considering all of the evidence, including reasonable inferences, in the light most favorable to the plaintiff. . . . A verdict may be directed where the decisive question is one of law or where the claim is that there is insufficient evidence to sustain a favorable verdict. . . . If the evidence in a case presents such a situation that the minds of fair and reasonable [jurors] could therefrom reach but one conclusion, there is no question for a jury. The case should be decided by the judge as essentially a question of law, and he may direct a verdict. . . . While it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation." (Citations omitted; internal quotation marks omitted.) *Vona* v. *Lerner*, 72 Conn. App. 179, 186–87, 804 A.2d 1018 (2002), cert. denied, 262 Conn. 938, 815 A.2d 138 (2003).

The plaintiff's cause of action against the defendants can be separated into two allegations: (1) the defendants conspired to arrest the plaintiff falsely and to prosecute him, and (2) the defendant members of the police department violated the plaintiff's civil rights pursuant to 42 U.S.C. § 1983[5] by subjecting him to false

---

[5] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

arrest and malicious prosecution. We will discuss those allegations separately.

I

The plaintiff's central claim of a conspiracy concerns Connelly and any potential negative feelings that he may have had toward the plaintiff. As previously mentioned, the plaintiff presented evidence that he had been critical of Connelly's performance as school superintendent thirteen years earlier when the plaintiff was active in city politics. That evidence of ill will toward the plaintiff by one defendant is the *sole* piece of evidence the plaintiff presented to the jury to establish a conspiracy among the defendants and the liability of Connelly.[6]

The plaintiff presented no evidence that any of the investigative procedures conducted by the defendants were unreasonable or excessive. The plaintiff did not present any evidence that he was treated differently because of the potential ill will from an incident occurring more than ten years before the allegations by the plaintiff's students. The only evidence of communication between Connelly and the other defendants was a telephone call to determine the contact information for the individuals the detectives should interview concerning the alleged incident. The police investigation was initiated by one of the alleged victims' parents. There was no evidence that the defendant Connelly assisted the police investigation outside his expected duties as a school superintendent.

Our Supreme Court has stated that "[d]rawing logical deductions and making reasonable inferences from

liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[6] The plaintiff's individual claim against Connelly seems to be that a school superintendent such as Connelly should have taken Spivack's statement that she did not see the plaintiff touch the students and dismiss the investigation. We note that Connelly correctly informed the proper authorities of the alleged incident and assigned the investigative responsibilities to another member of the school administration.

facts in evidence, whether that evidence be oral or circumstantial, is a recognized and proper procedure in determining the rights and obligations of litigants, but to be logical and reasonable *they must rest upon some basis of definite facts, and any conclusion reached without such evidential basis is a mere surmise or guess.*" (Emphasis added; internal quotation marks omitted.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 34, 734 A.2d 85 (1999). "A directed verdict is appropriate when the jury could not reasonably and legally have reached any other conclusion. . . . A finding of liability cannot be predicated on conjecture, surmise or guess. . . . Mere possibilities or suppositions will not sustain a legitimate inference of a fact, nor can such an inference be drawn by conjecture only." (Citations omitted; internal quotation marks omitted.) *Pagani* v. *BT II, Ltd. Partnership*, 24 Conn. App. 739, 751, 592 A.2d 397, cert. dismissed, 220 Conn. 902, 593 A.2d 968 (1991).

The plaintiff was under an obligation to present evidence to support more than mere speculation of a conspiracy based on the past ill will of one defendant. In light of the lack of evidence presented at trial, a directed verdict with regard to the alleged conspiracy among the defendants for violating the plaintiff's constitutional rights was appropriate.

II

The plaintiff's allegations against the defendants as individuals, excluding Connelly, involve claims of a violation of his civil rights pursuant to 42 U.S.C. § 1983,[7] false arrest and malicious prosecution. At the core of those allegations is the lack of probable cause to seek an arrest warrant and the partial exclusion of Spivack's *full* statement concerning the alleged events. Essentially, the plaintiff claims that the defendants *explicitly*

---

[7] See footnote 5.

should have stated that Spivack observed that the plaintiff did not touch, hit or push his students instead of stating only her observations of the students having been disorderly and the plaintiff having raised his voice to the students.

Actions arising from § 1983 claims sound in tort liability and defenses to tort actions will be recognized. See *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 79, 808 A.2d 1107 (2002); see also *Malley* v. *Briggs*, 475 U.S. 335, 339, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley* v. *Briggs*, supra, 341.

Police officers are entitled to qualified immunity from civil actions arising from § 1983 claims for discretionary actions. *Ham* v. *Greene*, supra, 248 Conn. 519–20; see also *Malley* v. *Briggs*, supra, 475 U.S. 340. "The defense of qualified immunity shields government officials from civil liability if the official's conduct did not violate constitutional rights that were clearly established at the pertinent time or if it was objectively reasonable for the official to believe that the conduct did not violate such rights. . . . As a general rule, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." (Citations omitted; internal quotation marks omitted.) *Weyel* v.

*Catania,* 52 Conn. App. 292, 296, 728 A.2d 512, cert. denied, 248 Conn. 922, 733 A.2d 846 (1999); see also *Anderson* v. *Creighton,* 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

In *Ham,* our Supreme Court addressed the issue of qualified immunity and whether information excluded from an arrest warrant application was material or extraneous. See *Ham* v. *Greene,* supra, 248 Conn. 520–21. The plaintiff in *Ham* sued police officers after they executed an arrest warrant for him in connection with a fatal shooting. The defendants allegedly had omitted several portions of witnesses' statements, including physical descriptions of the alleged shooter that conflicted with the plaintiff's physical characteristics and conflicting statements by a witness as to the plaintiff's location in or outside a vehicle when the shooting took place. Id., 515–16. The arrest warrant application also failed to mention previous statements that did not identify the plaintiff as the shooter given by a witness who later incriminated the plaintiff. Id. Further, the application did not mention that another person had boasted to inmates that he was responsible for the shooting and that he had provided "details about the incident and its victims." Id., 516.

The *Ham* court was asked to determine if the trial court improperly had failed to grant a motion for a directed verdict in favor of the defendants in that case on the issue of qualified immunity. Id., 519. "A subjective inquiry into an official's personal belief is rejected in favor of an objective analysis of what a reasonable officer in [the] defendant's position would believe. In the context of an allegedly unconstitutional arrest, the objective reasonableness standard bars the defense of qualified immunity [o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." (Internal

quotation marks omitted.) Id., 520; see also *Simkunas* v. *Tardi*, 930 F.2d 1287, 1291 (7th Cir. 1991).

"[I]n the context of a § 1983 claim, and for purposes of deciding whether to grant a motion for summary judgment or to direct a verdict, the determination of whether factual disputes are material to the resolution of the issue of qualified immunity is made by applying the same affidavit correction test used in a *Franks* hearing. See *Franks* v. *Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). Under that test, factual disputes are extraneous to the resolution of the issue of qualified immunity if the affidavit accompanying the warrant is sufficient, after correcting for material misstatements or omissions, to support a reasonable officer's belief that probable cause existed. . . . Only if the corrected affidavit did not support an objective finding of probable cause would the factual disputes be material to resolving the issue of probable cause. In that case, summary judgment [appropriately would] be denied and [the] factual issues involving the immunity doctrine would be submitted to the jury. . . . Therefore, before taking the issue of qualified immunity away from the jury as a matter of law, the trial court must first determine that there are no material issues of fact relevant to the existence of probable cause." (Citations omitted; internal quotation marks omitted.) *Ham* v. *Greene*, supra, 248 Conn. 521; see also *Cartier* v. *Lussier*, 955 F.2d 841, 845 (2d Cir. 1992).

"In this regard, the materiality of a misrepresentation or an omission is a mixed question of law and fact. . . . But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate *in doubtful cases*. . . . Nonetheless, if the evidence, viewed in the light most favorable to the [plaintiff], discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the

corrected affidavits, then under the ordinary standard for summary judgment . . . a qualified immunity defense must be upheld." (Citations omitted; emphasis added; internal quotation marks omitted.) *Ham* v. *Greene*, supra, 248 Conn. 522.

In this case, we conclude, as a matter of law, that the facts do not present a doubtful case as stated in *Ham* v. *Greene*, supra, 248 Conn. 522. Given the statements of seven students corroborating each other's stories concerning the plaintiff's alleged actions *and* the school nurse's report that documented their physical injuries, a neutral magistrate would have signed the arrest warrant application even if Spivack's full statement had been included. Unlike the omissions our Supreme Court found in *Ham*, Spivack's full statement was not a material omission.

Having determined that the investigating officers' actions were objectively reasonable and a corrected arrest warrant application would have established sufficient probable cause to proceed against the plaintiff, the defendants are entitled to qualified immunity. "After performing this correcting process, if there remains an objective basis supporting probable cause, no constitutional violation of the plaintiffs' Fourth Amendment rights has occurred, the factual disputes are not material to the use of the qualified immunity defense, and summary judgment should be granted to the defendant. Only if the corrected affidavit did not support an objective finding of probable cause would the factual disputes be material to resolving the issue of probable cause. In that case, summary judgment must be denied and these factual issues involving the immunity doctrine would be submitted to the jury." *Cartier* v. *Lussier*, supra, 955 F.2d 845–46; see also *Ham* v. *Greene*, supra, 248 Conn. 522.[8] As a result of our finding that probable

---

[8] Summary judgment and directed verdicts shall be granted on the same facts. *Truglio* v. *Hayes Construction Co.*, 66 Conn. App. 681, 693, 785 A.2d 1153 (2001) (*Landau, J.*, concurring).

cause to arrest the plaintiff did exist, the defendants as a matter of law were entitled to qualified immunity for their actions.[9] Therefore, the court's granting of the defendants' motion for a directed verdict with respect to allegations of false arrest and malicious prosecution was proper.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[9] We note that initially the court improperly submitted the issue of probable cause to the jury under the facts of this case. "When [the United States District Court] denied summary judgment and decided to submit interrogatories to the jury, the trial judge recognized the applicable rules of law, but failed to determine expressly whether the facts in the probable cause affidavit altered by the correcting process did or did not support an objective basis for finding probable cause. Government officials protected by qualified immunity from litigating insubstantial claims are entitled, at a minimum, to have this threshold determination expressly made in the record. Without such an express finding, we may not assume it was made. This failure by the district court constituted a fundamental error in applying the qualified immunity doctrine." *Cartier* v. *Lussier,* supra, 955 F.2d 846.

We further note it would be particularly difficult and problematic to instruct a jury as to the standard it should apply to determine if, under the corrected arrest warrant application, a neutral magistrate would have enough evidence to establish probable cause in a doubtful case, as stated in *Ham.* See *Ham* v. *Greene,* supra, 248 Conn. 522; contra *Simkunas* v. *Tardi,* supra, 930 F.2d 1291 ("whether qualified immunity attaches to the police officers' actions is always one for the judge to decide").